## Henry K. Wick and Thomas Vernam v. Benjamin W. Bredin, Albert Egbert and Bertric Egbert, Appellants.

189    83
193   364

189         83
35 SC  ³495

189      83
37SC   ¹253

*Fixtures—Real and personal property—Intention—Evidence—Mines and mining—Forfeiture.*

In determining whether personal property has become a fixture and part of the land, it is not the character of the physical connection with the realty which constitutes the criterion of annexation, but it is the intention to annex and identify the property with the realty.

Where an agreement in writing conveys all the coal under a tract of land, and provides that the grantees "shall have the right to abandon said land and mining at any time, and remove all their buildings and fixtures," it is the clear intention of the parties that the buildings and fixtures shall not become a part of the realty either before or after abandonment, and this intention is not defeated by a subsequent agreement providing for a forfeiture of the contract for nonpayment of rentals, and a declaration of such forfeiture by the lessor.

Forfeitures are odious to equity; it is seldom it will enforce them even in a clear case, but never in a doubtful one.

Argued Oct. 25, 1898. Appeal, No. 162, Oct. T., 1898, by defendants, from decree of C. P. Mercer Co., June T., 1897, No. 1, on bill in equity. Before GREEN, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Bill in equity to declare mining improvements part of realty.

The facts appear by the opinion of MILLER, P. J., which was as follows:

By an agreement dated February 10, 1870, as modified by agreements dated January 20, 1881, and June 15, 1888, Thomas Vernam granted to A. G. Egbert the coal underlying a tract

of land in Jackson township, Mercer county, subject to the payment of royalty, the minimum quarterly royalty being $250, payable on the 1st days of January, April, July and October of each year. It was provided in said agreements that the contract between the parties was to remain in force until all the merchantable coal underlying the said tract of land had been mined and removed; and also that the failure to pay the royalty provided in said agreements for a period of six months after it became due should work a forfeiture of said agreements, at the election of said Vernam, but that such forfeiture should not relieve the first party, his heirs or assigns, from the payment of any royalty then due and payable under the said agreements.

By virtue of said agreements A. G. Egbert, and those claiming under him, opened a coal mine on said tract of land, known as the Shenango mine, and placed on the premises, in connection with said mine, houses, tipples and other buildings, boilers, engines, railroad tracks on the surface and in the bank, pumps, scales, mine cars, and other appurtenances and fixtures necessary or convenient for the operation of said mine. By an agreement between the said Vernam and Henry K. Wick all the rights of the said Vernam to and under said agreements passed to said Wick.

By mortgage dated April 25, 1894, and recorded in Mercer county on April 28, 1894, A. G. Egbert conveyed in mortgage to Benjamin W. Bredin, Trustee, all the coal and other mineral interests held and owned by the said Egbert in the aforesaid Vernam tract of land; also, all the machinery and fixtures belonging to him in, about, pertaining to or on said tract; and by deed dated October 12, 1895, the said A. G. Egbert transferred to Bertric Egbert, one of the defendants, all his interest under the aforesaid agreements with the said Vernam.

On March 9, 1897, E. W. Eckles, trustee, who had a judgment of record in the court of common pleas of Mercer county at No. 334, January term, 1897, against Bertric Egbert, issued an execution on said judgment against the said Bertric Egbert; and the sheriff, by virtue of said writ, levied, inter alia, upon the following property: "65 bank coal cars, 4 boilers, 2 engines, 3 steam pumps, 100 feet 10-inch pipe, 75 feet 8-inch pipe, tipple and all fixtures, and 3 pairs scales."

On March 17, 1897, by virtue of said levy, the sheriff sold the foregoing and other property, levied upon by virtue of said writ as personal property, to Benjamin W. Bredin, one of the defendants in this bill, and made return thereof to court.

Subsequently, by virtue of the same writ, the sheriff of Mercer county levied, inter alia, upon the real estate described in the agreements between the said Vernam and the said A. G. Egbert, as aforesaid, and made return that he had sold the same on April 19, 1897, to Albert Egbert, another of the defendants in this bill. On April 22, P. M., 1897, the deed from the sheriff to Albert Egbert was duly acknowledged in open court.

On April 21, 1897, a demand in writing was duly served upon Bertric Egbert for the royalty then due and unpaid on the aforesaid agreements by E. S. Templeton, attorney in fact for the plaintiffs in this suit. On the following day, viz: April 22, A. M., 1897, upon Bertric Egbert stating that he would not pay the aforesaid royalty, a written notice was served upon him that the plaintiffs elected to forfeit said agreements, and demanded immediate possession of the properties covered by said agreements. A further demand was also made upon Bertric Egbert for the moneys due under said agreements.

Similar demands and notices were served upon Albert Egbert on April 21, 22 and 24, 1897.

On April 26, 1897, the bill in this case was filed, alleging, substantially, the foregoing facts, and also alleging that Benjamin W. Bredin, one of the defendants, was taking up the railroad tracks at the mine on said tract of land, and was about to remove the same, and about to detach and remove other property, viz: "4 boilers, 2 engines, 3 pumps, 100 feet 10-inch pipe, 75 feet 8-inch pipe, 65 bank cars, 1 wagon scale, 1 railroad scale, 1 tipple scale, track in bank, cables and all fixtures, air-fans, tipples and all fixtures," thereby injuring and destroying the said premises, and asking relief as follows:

1. That the said agreements be declared null and void in every particular, except that the royalties due at the date of such forfeiture may be recovered.

2. That the title to and right of possession in said land, including the coal, coal mine and fixtures, and all other improvements placed upon said land under said agreements and yet thereon, including the property described in schedule B, be de-

creed to be in said Thomas Vernam and Henry K. Wick, and that such possession be delivered to them.

3. That by injunction, preliminary until final hearing and perpetual thereafter, the said defendants be enjoined from further interference with the said property of said plaintiffs.

4. That the amounts due under said agreements be declared; that the royalties held by said Henry K. Wick under said Ormsby lease be applied to the payment thereof, and that the balance of said royalties be decreed to be paid by the parties defendant liable for the same.

5. For such other and further relief as is proper in the premises.

On April 29, 1897, the parties agreed upon the following order, which was made by the court:

"And now, April 29, 1897, it is, by consent of all parties hereto, ordered that there be sold at ten dollars per ton, in place, to the Franklin Street Railway Company, so many of the rails of the steam railroad on the premises described in the bill in this case as said company desire to buy, said company to remove and pay for the same at once, the purchase money to be paid to and held by the Mercer County National Bank, of Mercer, Pa., subject to the joint order of W. H. Cochran and Q. A. Gordon, or in default thereof to the order of the court, said fund to stand in the name of said Cochran and Gordon as trustees. It is further ordered, by like consent, that all of the property in the inside of the mine on said premises which is worth taking out, except the lining of the shaft and the supports of entries, be removed and piled on the surface of the premises as speedily as practicable; that said work shall, until further order of this court, be done under the direction of Fleming Perrine, assisted by Harry Dye and such others as said Perrine may select. The said Perrine shall, subject to the further order of the court, decide what shall be taken out and how the work shall be done. Said Perrine shall receive $2.50 per day for time actually and necessarily spent; said Dye's compensation shall be fixed by consent, or in default thereof, by the court.

"The cost of such work and of pumping the mine during such work shall be paid out of the fund arising from the sale of such rails. Such removal of said rails and other property shall not in anywise affect the rights of the parties hereto, and the

fund arising from such sale shall abide the event of the suit and go to the party who shall be held entitled to the property. The property so removed, and the remaining property in dispute upon the said premises, shall remain and be subject to the order of the court from time to time."

Under the pleadings and evidence in this case we find the following additional facts:

1. That the several articles mentioned in schedule B of plaintiffs' bill, namely, "4 boilers, 2 engines, 3 pumps, 100 feet of 10-inch pipe, 75 feet of 8-inch pipe, track for tipple and main line, tipple and all fixtures, 65 bank cars, one wagon scale, one railroad scale, one tipple scale, railroad track and switches, track in bank, cables and all fixtures and air fans," being the same articles in controversy in this case, and being upon the tract of land mentioned in the aforesaid agreements between Thomas Vernam and A. G. Egbert, were placed there by the said A. G. Egbert, or those holding under him, for use in mining, removing and marketing the coal from the lands in question, and that they were necessary for said purposes; that without these several fixtures the said Shenango mine would not be properly or conveniently equipped for the purposes intended and could not be conveniently or successfully operated as a coal mine, and that the said several above mentioned articles are fixtures and part and parcel of the freehold.

2. That there was no abandonment by Bertric Egbert of the tract of land in question.

3. That there was due plaintiffs at the date of the filing of the bill, as royalty under the aforesaid agreements, the sum of $704.75.

4. That demand was properly made upon Bertric Egbert and Albert Egbert for the royalty due prior to the filing of this bill, and that they and each of them neglected and refused to pay the same.

5. That notice of the election of the plaintiffs to forfeit the agreements originally entered into between Thomas Vernam and A. G. Egbert, as aforesaid, was duly served upon Bertric Egbert and Albert Egbert, and each of them, prior to the filing of this bill.

### CONCLUSIONS OF LAW.

1. That under the agreements set forth in the first paragraph of plaintiffs' bill the plaintiffs had the right to terminate the estate of the second party, and his assigns, by forfeiture for nonpayment of the royalty stipulated for in said agreement. And, under the evidence in this case, such forfeiture was regularly made and declared, and by it all the estate treated by said agreements was duly terminated and ended.

2. That when the second party to said agreements, or his assigns, put upon the land in question fixtures necessary and essential for the mining of the coal in the land these fixtures became a part of the estate created by the said agreements (which in law is a fee simple estate in the coal and mining rights and privileges granted), and therefore a forfeiture of the estate granted by said agreements would carry the fixtures with it.

3. That said fixtures being a part of the fee simple estate of the second party and his assigns, under said agreements, were in fact and in law a part of the realty, and could not be sold on execution against the owner of the said fee simple estate as personal property without there being first a legal severance, of which severance there is no evidence in this case.

4. That under said agreements there is no right of removal of appurtenances and fixtures until there is a legal abandonment of the estate created by the said agreements, and there being no evidence in this case of any abandonment by the owner of said estate, no right of removal of said appurtenances and fixtures existed.

By the terms of the modified contract of January 20, 1881, it is expressly stipulated that the contract is "to remain in force until all the merchantable coal has been mined and removed from under the land mentioned in said contract." There is neither allegation nor proof that the merchantable coal has been mined and removed from the land in question, and until it is so mined and removed neither A. G. Egbert nor his assigns would have the right to abandon the premises and thereby relieve themselves from liability for the minimum quarterly royalty; neither could they dismantle the mine and remove mine fixtures placed upon the premises and necessary and conven-

ient for mining of coal, against the protest of the plaintiffs, until the contract was ended and the royalty paid.

Benjamin W. Bredin, as purchaser at the sheriff's sale, even if the fixtures could have been legally sold on execution as personal property, would have no higher rights as to removal of the said fixtures than would Bertric Egbert; the same would be true of Albert Egbert, who claims by virtue of the sheriff's sale and deed executed and delivered to him in pursuance thereof. There is neither allegation nor proof of legal severance of any of the property in dispute before the sheriff's sale at which Bredin claims to have purchased.

Under all the authorities the estate of A. G. Egbert, and his assigns, is real estate. The agreements constituted the transaction, and sale of the coal in place and the royalties are regarded in the same light as purchase money of real estate sold, and not as rents: Lazarus's Estate, 145 Pa. 1.

Hence, if either A. G. Egbert, or Bertric Egbert, or Albert Egbert, while owing royalty to plaintiffs, had undertaken to dismantle the mine and remove the fixtures placed on the premises for use in mining, removing and marketing the coal from the lands of plaintiffs, and necessary for said purpose, and without which the coal could not be successfully and conveniently mined, removed and marketed, equity would have restrained them from so doing.

It is in proof, and not denied, that all the property mentioned in schedule B of the bill, except the bank cars, was affixed to the real estate, and that it was all, including the bank cars, used in operating the Shenango mine. It is also admitted that the property mentioned in schedule B of plaintiffs' bill is the same property levied upon and sold by the sheriff on fi. fa., No 29, April term, 1897, common pleas of Mercer county, and purchased by Bredin.

Under any circumstances, therefore, the defendants, or any of them, would have no legal right to remove the property in dispute against objection of the plaintiffs.

The court entered the following decree:

And now, June 6, 1898, in accordance with the opinion filed in the above case on the 30th day of March, 1898, it is ordered, adjudged and decreed:

1. That the agreements recited in the first paragraph of plain-

tiffs' bill are and are hereby declared to be null and void in every particular, except that the royalties due at the time of forfeiture, to wit: April 22, 1897, may be recovered.

2. That the title to and right of possession in the land described in the said agreements, including the coal under said land, and the coal mine and fixtures, and all other improvements placed upon the said land under the said agreements and yet thereon, including the property described in schedule B, annexed to plaintiffs' bill, are and are hereby decreed to be in the said Thomas Vernam and Henry K. Wick, and defendants are hereby ordered and directed to deliver possession thereof to them.

3. That the defendants, and each of them, are hereby enjoined from further interference with the property of the plaintiff hereinbefore referred to.

4. That there is due the said complainants from Bertric Egbert, one of the defendants, the sum of $704.75, with interest from this date, which sum said Bertric Egbert is hereby directed to pay to the said complainants.

*Errors assigned* were the conclusions of law quoted in the opinion of the Supreme Court, and the decree as above, quoting it.

*W. H. Cochran*, for appellants.—It is not the province of a court of equity to enforce penalties and forfeitures: Meigs's App., 62 Pa. 35.

The property was legally severed from the real estate of the plaintiff by virtue of the contract reserving the title and right of removal by the lessee, and this as effectually as though actually severed: Vail v. Weaver, 132 Pa. 370; 2 Smith's Leading Cases (8 Am. ed.), 244; Charlotte Furnace Co. v. Stouffer, 127 Pa. 340; Watts v. Lehman, 107 Pa. 106; Seeger v. Pettit, 77 Pa. 440; McCullough v. Irvine, 13 Pa. 442.

That a boiler and engine put up by a tenant are movable fixtures is beyond doubt: Hey v. Bruner, 61 Pa. 90; Lemar v. Miles, 4 Watts, 332; Mitchell v. Freedley, 10 Pa. 198; White's App., 10 Pa. 252.

*E. S. Templeton* and *Q. A. Gordon*, for appellees.—It is plain

that the fixtures could not be sold as personal property on execution against the owner of the fee, without a prior severance, of which there is no evidence in this case: Gray v. Holdship, 17 S. & R. 413.

Forfeitures as a general rule are odious and have little favor with a court of equity, but this rule, like every other, has its exceptions: Brown v. Vandergrift, 80 Pa. 142.

The appellees, having a lien for this royalty upon the granted estate, including the machinery and fixtures referred to in the said bill, are entitled to the intervention of a court of equity to prevent the destruction of the subject of the lien: Hoskin v. Woodward, 45 Pa. 42; Roberts v. Dauphin Deposit Bank, 19 Pa. 71; Witmer's App., 45 Pa. 463; Gill v. Weston, 110 Pa. 312.

When equity jurisdiction has once attached in a case like the present one it is ordinarily retained for the purpose of administering full relief: Allison's App., 77 Pa. 221; Adams's App., 113 Pa. 449.

Opinion by Mr. Justice Dean, January 2, 1899.:

The facts in this case are fully found and orderly stated in the able opinion of the learned judge of the court below. The questions raised by this appeal, are whether his conclusions of law from the facts are warranted. Those conclusions are as follows:

"1. That under the agreements set forth in the first paragraph of plaintiffs' bill, the plaintiffs had the right to terminate the estate of the second party, and his assigns, by forfeiture for nonpayment of the royalty stipulated for in said agreement. And, under the evidence in this case, such forfeiture was regularly made and declared, and by it all the estate created by said agreements was duly terminated and ended.

"2. That when the second party to said agreements, or his assigns, put upon the land in question fixtures necessary and essential for the mining of the coal in the land, these fixtures became a part of the estate created by the said agreements (which in law is a fee simple estate in the coal and mining rights and privileges granted), and therefore a forfeiture of the estate granted by said agreements would carry the fixtures with it.

"3. That said fixtures being a part of the fee simple estate of the second party, and his assigns, under said agreements,

were in fact and in law a part of the realty, and could not be sold on execution against the owner of the said fee simple estate as personal property without there being first a legal severance, of which severance there is no evidence in this case.

"4. That under said agreements there is no right of removal of appurtenances and fixtures until there is a legal abandonment of the estate created by the said agreements, and there being no evidence in this case of any abandonment by the owner of said estate, no right of removal of said appurtenances and fixtures existed."

The decree was that the property in dispute be delivered to plaintiffs.

It will be noticed that the conclusion from the facts, in substance, is, that the chattels by annexation to the realty as necessary to the operations of the mines, became fixtures and a part of the fee simple estate of the lessor. But the mere physical attachment to the realty does not constitute them part of it. The whole subject is most exhaustively discussed by AGNEW, J., in Hill v. Sewald, 53 Pa. 271. It is held, quoting Voorhis v. Freeman, 2 W. & S. 116, that the old common-law doctrine of physical attachment as a criterion is exploded in this state. In Seeger v. Pettit, 77 Pa. 437, it is held that the true rule to be deduced from all the authorities, is, that it is not the character of the physical connection with the realty which constitutes the criterion of annexation, but it is the intention to annex and identify the property with the realty. What was the intention of the parties to the contract for sale in place of the coal, concerning the boilers, engines and other machinery indispensable to mining operations, and which of necessity were placed upon the land of the lessor? The first agreement dated February 10, 1870, conveys all the coal upon the tract to Egbert and then comes this stipulation: "And the second parties or their assigns shall have the right to abandon said lands and mining at any time and remove all their buildings and fixtures." Two agreements supplementary to this one, were afterwards made between the parties, and some of the provisions in the first were expressly modified, but the stipulation as quoted was neither abrogated nor modified, nor did the parties so far as appears, intend it should be touched. These words negative any thought of destroying the identity of the personalty by

attaching it to the realty; if it had been the intention so to do, and make it part thereof, so as to subject it to forfeiture under the contract, the parties could easily have said so, as was said in the Egbert and Wick contract offered in evidence, where it is stipulated, that on default the lessor shall have the right to declare the contract null and void, and possess himself of the property with all the buildings and fixtures. They, however, were not even silent on the subject, but by affirmative words established the lessees' right to the separate ownership and possession of his personal property. If it did not become part of the realty by the conveyance of the coal and its connection therewith, then its subsequent use by the lessee as an incident to his enjoyment of the estate in the coal did not make it such; nothing less than a change in the written agreement could have changed it from personal property, which it was, into land, which it was not.

The learned court below was of the opinion, that the property had the stamp of personalty only, on abandonment of the mine by the lessee, and there was no abandonment; that during his possession, it was realty. The stipulation is much broader than this; it reserves the right to abandon the mine at any time and remove the property; that in effect, preserved to it from the very beginning the character of personalty, that is, the right to remove it when he chose so to do, for the removal necessarily was a stoppage of work and abandonment. Nor as argued by appellee does the provision in the second agreement, that Egbert was to mine all the merchantable coal in the tract affect this intention to preserve to the property its character as personalty; this provision might have the effect of postponing the date of abandonment, and a violation of it by Egbert might subject him to an action on his covenant, but neither expressly nor by implication does it turn into realty that which the parties had plainly agreed should be personalty; in fact in the third agreement they say: " In other respects the original contract to remain unchanged," that is, where there had been no express modification, the three agreements were to stand together, as embodying the intention of the parties.

But by the first conclusion of law, the court is of opinion, that under a forfeiture clause for nonpayment of royalty, the title to the property had become vested in plaintiffs.

In clause X of the second agreement, occurs this provision: "It is further understood between the parties to this contract, that a failure to pay any of the semi-annual payments.as they fall due on the first days of July and January of each year during the continuance of this and the original contract for a period of six months after the same has become due and payable, then the original contract or lease and this contract shall become null and void at the election of said Vernam, and time is of the essence of the contract in this respect."

Under this clause on April 24, 1897, the lessor gave notice of forfeiture or his intention to declare null and void the contracts. It is not necessary to discuss the point made by appellant, that under another agreement, made pending certain litigation in the common pleas of Mercer county, there was no default in payment when the lessor declared the forfeiture, for even if there was default, the lessor could not, under this clause take possession of the lessee's personal property. Forfeitures are odious to equity; it is seldom it will enforce them even in a clear case, but never in a doubtful one. The provision here is, that the lessor may elect to declare the contract null and void; what is the effect of thus eliminating the contract? Just this, and no more, all the estate, rights and privileges, which by the contract passed to the lessee, revested in the lessor. By that contract, the mining fixtures and machinery were the personal property of the lessor, and so continued; destroying, forfeiting or making void his contract, affected not that which was excluded from the operation of it; the intention of both in the beginning to distinguish it as personalty from realty, could not be defeated by the act of one of them. Declaring the contract void enabled the lessor to resume possession of that which he had granted, not of that of which he never had possession, and to which by his own contract he had no claim.

The decree of the court below is reversed and bill dismissed at costs of appellee.